Steven P. SANDERS, Daniel M. Porush, Jordan Shamah, and Andrew T. Greene, Petitioners,

v.

F. Clark GARDNER, Respondent.

No. 97–CV–1928(JS).

United States District Court, E.D. New York.

May 15, 1998.

Martin P. Unger, Tenzer Greenblatt L.L.P., New York, NY, for Petitioner Steven P. Sanders.

Mark E. Gefland, Hicksville, NY, for Petitioner Daniel M. Porush.

David Hirschberg, Wexler & Burkhart, P.C., Mitchell Field, NY, for Petitioner Jordan Shamah.

James C. Sherwood, Schlam Stone & Dolan, New York, NY, Robert B. McKay, Carney & McKay, Garden City, NY, for Petitioner Andrew T. Greene.

James M. Strauss, Goodkind Labaton Rudoff & Sucharow L.L.P., New York, NY, for Respondent F. Clark Gardner.

### MEMORANDUM AND ORDER

SEYBERT, District Judge.

Presently before the Court are numerous motions from the cases originally docketed as 97–CV–1928, 97–CV–1972, 97–CV–2124 and consolidated under lead case number 97–CV–1928. These cases arise from a securities arbitration proceeding entitled "In the Matter of the Arbitration Between F. Clark Gardner, Claimant [against] Stratton Oakmont, Inc., Samuel R. Weber, Daniel M. Porush, Jordan Shamah, Andrew T. Greene, Paul F. Byrne, Mathias V. Tiffert, Leonard Dunn and Steven Sanders, Respondents" and the resultant Award dated April 15, 1997, Arbitration No. 96–02076.

### PROCEDURAL HISTORY

In March 1996, Claimant F. Clark Gardner ("Gardner" or "Respondent"), commenced an arbitration proceeding pursuant to a customer agreement (the "Agreement"), against Stratton Oakmont, Inc. ("Stratton"), a registered broker/dealer of securities, and its principal officers, directors and supervisors, Daniel M. Porush ("Porush"), Steven P. Sanders ("Sanders"), Jordon Shamah ("Shamah"), and Andrew T. Greene ("Greene"), (collectively the "Petitioners"), and others, before the National Association of Securities Dealers ("NASD"). After nine conferences and hearings were held, a panel of three arbitrators, Sandra L. Malek, Esq., Mary E. Cobb, and Louise D. Lillard, Esq., (collectively the "Arbitrators"), rendered a unanimous Award (the "Award"), in favor of F. Clark Gardner (Claimant below, Respondent herein), as against Daniel M. Porush, Jordan Shamah, Andrew T. Greene, and Steven P. Sanders (Respondents below, Petitioners herein).

Immediately thereafter, Petitioners Porush, Shamah, Sanders and Greene initiated suit in this Court and moved individually and collectively to vacate the arbitration award. Respondent Gardner moved to confirm the arbitration award. Respondent then moved for an Order of Attachment, pursuant to Fed.R.Civ.P. 64, as against all property and assets owned or controlled by Porush and for an Order, pursuant to Fed.R.Civ.P. 37, compelling the deposition of Porush. Petitioner Greene's motions to intervene and to amend the caption were stipulated to by the parties on April 29, 1997, and were subsequently granted by the Court. The other aforementioned motions are all decided herein.

### BACKGROUND

#### I. ACCOUNT ESTABLISHMENT AND TRADING

Respondent F. Clark Gardner, a physician residing in California, was contacted via telephone in or about November 1994, by Samuel R. Weber ("Weber"), an employee of Stratton, to solicit new business. Gardner had previously invested in stocks, bonds, and mutual funds and listened to Weber's sales pitch. Weber highlighted Stratton's success in new offerings and its daily oversight of customer accounts, stressing it protects against downward stock price movements of more than two points. (Arb. Amended Claim ¶ 6). Gardner indicated his investment objective was to purchase securities that offered growth potential, but would not present any significant risk of loss to the principal invested. (Arb. Amended Claim ¶ 6).

Weber continued contacting Gardner during the month and inquired into his net worth and annual income. Weber sent Gardner a completed Retail New Account Applica-

tion which became the Agreement, and it erroneously over estimated Gardner's net worth at $2,000,000 plus,[1] and his investment objective as speculative activity in growth companies. (Arb. Amended Claim ¶ 10). Gardner purportedly questioned these entries and was informed by Weber that they were computer generated and unimportant. (Arb. Amended Claim ¶ 10).

Accordingly, Gardner agreed to open an account with Stratton, account number 492990, and initially agreed to a purchase of 200 shares of Dr. Pepper. It is noteworthy, though legally incidental, that a copy of the Agreement signed by F. Clark Gardner was never produced. Directly above the customer signature line the Agreement states:

> Your Signature must appear below. By signing this Agreement, I acknowledge that I have read, understand and agree to

the terms of the following Customer Agreement, which is incorporated as if fully set forth hereat. *I am also fully aware of, and completely understand and agree to the pre-dispute arbitration clause at paragraph 9 of this agreement* .... I have read the text, including the terms and conditions set forth on the reverse side of this Retail New Account Application, and agree to be bound thereby. [italicized emphasis in original].

The other pertinent sections of the Agreement include paragraph nine, the Arbitration Clause,[2] paragraph ten, the Applicable Rules and Regulations,[3] and paragraph eleven, the Governing Law.[4]

The following transactions as provided in Gardner's Arbitration Amended Claim were the basis of the arbitration dispute in issue,

---

1. Gardner had informed Weber that his total net worth was less than $1,300,000. (Arb. Amended Claim ¶ 9).

2. Arbitration Clause: *Arbitration is final and binding on the parties. The parties are waiving their right to seek remedies in court, including the right to jury trial. Pre-arbitration discovery is generally more limited than and different from court proceedings. The arbitrators award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.* The undersigned agrees and, by carrying and introducing an account for the undersigned, Adler, Coleman Clearing Corp. (AC), and Stratton Oakmont, Inc. (OKOK), respectively agree that except as inconsistent with the foregoing sentence, all controversies which may arise between the undersigned and AC and/or OKOK concerning any transaction or the construction, performance or breach of this or any other agreement between the undersigned and AC and/or OKOK, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration to be held in accordance with the rules of the Board of Arbitration of The New York Stock Exchange, Inc., or the Code of Arbitration Procedure of the National Association of Securities Dealers Inc., whichever the undersigned may select. If the undersigned does not make a selection by registered or certified mail addressed to AC or OKOK at its main office within five business days after AC or OKOK shall have given notice to the undersigned requesting a selection, AC and/or OKOK may make a selection on behalf of the undersigned. No arbitration or other proceeding with respect to a controversy may be com-

menced by the undersigned more than one year after the action or omission upon which such controversy is based. If the undersigned shall by any court proceeding be unsuccessful in resisting arbitration, the undersigned shall reimburse AC and OKOK for all costs and expenses (including attorneys' fees) incurred by them in connection with such court proceeding. Any arbitration award shall be final, and judgement on the award rendered may be entered in any court having jurisdiction. [italicized emphasis in original].

3. Applicable Rules and Regulations. All transactions effected pursuant to this Customer Agreement *shall be subject to (i) the constitution, by-laws, rules, regulations, customs and usages of the exchange or market and its clearing house, if any, where* such transactions are executed by Adler Coleman or its agents, (ii) applicable federal, *state and local laws, rules and regulations and* (iii) the constitution, by-laws, rules and regulations of any securities self-regulatory authority to whose jurisdiction Adler Coleman is subject, in each case whether now existing or hereafter adopted or amended.

4. Governing Law. Except as provided in Section 10, this Customer Agreement shall be governed by and construed, and the substantive rights and liabilities of the parties determined, in accordance with the laws of the State of New York. The undersigned acknowledges that the undersigned's Account Application has been submitted without solicitation by Adler Coleman upon the understanding that neither it nor any agreement related thereto shall be effective until they are accepted by Adler Coleman in the State of New York.

and were executed by and based upon representations of Samuel Weber.

 a) Purchased 200 shares of Dr. Pepper at $25¾ on 11/17/94; total $5,210;

 b) Purchased 2,000 shares of Select Media at $8 on 11/23/94; total $16,010;

 c) Purchased 3,000 shares of Select Media at $6⅜ on 12/21/94; total $19,135;

Gardner was apparently not familiar with Select Media nor was he informed that Stratton made a market in the security.[5] Gardner allegedly directed Weber to sell the Select Media stock in January and February 1995, however Weber did not carry out the instructions.

 d) Sold 5,000 shares of Select Media at 5¢ per share on 11/16/95; sale proceeds $240, total loss of $34,950;

 e) Purchased 4,000 shares of United Leisure at $5 on 1/23/95; total $20,010;

 f) Purchased 3,000 shares of United Leisure at $5⅜ on 2/6/95; total $16,125;

 g) Purchased 11,000 shares of United Leisure at $5 on 2/24/95; total $55,000;

 h) Purchased 1,000 units (combination of stocks and warrants) of Dual Star at $7 on 2/22/95; total $7,000;

 i) Purchased 7,000 shares of Dual Star at $6¼ on 2/22/95; total $43,750;

Stratton not only made a market for the Dual Star stock but also underwrote the issue two days prior. Two days later, Weber purportedly recommended selling Dual Star because of a trend he didn't like, yet one month later, he recommended purchasing it again.

 j) Sold 1,000 units and 7,000 shares of Dual Star on 2/24/95; sales proceeds of $54,730, total profit $4,845;

 k) Purchased 5,000 shares of Dual Star at $6¼ on 3/30/95; total $31,257;

 l) Purchased 5,000 shares of Dual Star at $10¼ on 4/13/95; total $51,227;

Gardner allegedly directed Weber to sell the Dual Star shares, and once again Weber failed to execute trades at the customer's direction.

 m) Sold 10,000 shares of Dual Star at $1¾₆ on 12/12/95; sales proceeds of $11,865, total loss $70,619;

 n) Purchased 500 units of Czech Industries at $7 on 6/16/95; total $3,500;

 o) Sold 500 units of Czech Industries at $3.586 on 11/16/95; sales proceeds of $1,793, total loss $1,707;

 p) Sold 18,000 shares of United Leisure at $2⅞₆ on 7/28/95; sales proceeds of $46,678; total loss of $44,477;

Gardner maintains the United Leisure stock was sold without his authorization and that Weber used the proceeds on that day to purchase Solomon Page Group, Ltd. ("Solomon")stock.

 q) Purchased 29,500 shares of Solomon at $1¾₆ on 7/28/95; total $46,104;

 r) Sold 29,500 shares of Solomon at $22/33 on 12/12/95; sales proceeds of $21,203; total loss of $24,901;

 s) Purchased 500 units of MVSI at $7 on 8/22/95; total $3,500;

 t) Sold 500 units of MVSI at $20⅝ on 10/12/95; sales proceeds of $10,303; total profit of $6,803;

 u) Purchased 1,000 units of Hemispherx at $3½ on 11/7/95; total $3,500;

 v) Purchased 1,000 units of Hemispherx at $8½ on 11/7/95; total $8,500;

 w) Sold 2,000 units of Hemispherx at $6¾ on 11/16/95; sales proceeds of $13,490; total profit $1,480.

Thus, over the thirteen month period, the Respondent, F. Clark Gardner, invested a total of approximately $328,993 and suffered a loss of $184,583. The Respondent further alleged that during the thirteen month period the account was turned over approximately four times by the Petitioner, Stratton, and that this "churning" was done for the sole purpose of generating commissions. (Arb. Amended Claim ¶ 28).

---

**5.** Typically the term market maker is defined pursuant to 15 U.S.C. § 78c(a)(38) as "any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis."

## II. GARDNER'S ARBITRATION CLAIMS

On or about May 7, 1996 Respondent filed his Statement of Claim for arbitration, which was subsequently amended on October 1, 1996. On or about July 12, 1996, the parties filed a signed Submission Agreement ("SA"), agreeing to submit the matter in controversy to arbitration and to abide by and perform any award rendered pursuant to the SA.

In arbitration, Gardner claimed that the Petitioners committed fraud by excessively trading his account and by trading in securities unsuitable for Gardner's investment objectives. These actions, Respondent maintained, constituted violations of state and federal securities laws and breached Petitioners' fiduciary duty as owed to the client/customer. In addition, Gardner asserts that Petitioners Stratton and its control persons failed to supervise the activities of their broker.

Accordingly, Gardner sought compensatory damages in the amount of $238,332, representing his trading losses, interest on the loss, the Petitioners' commissions and the NASD filing fee, and unspecified punitive damages.

The Petitioners generally denied the allegations asserting that the transactions in Respondent's account were carried out in accordance with Gardner's instructions and in conformity with all applicable rules, regulations, industry standards and practices.

## III. THE ARBITRATION HEARINGS AND AWARD

Five pre-hearing conferences were held between November 18, 1996, and March 27, 1997, and four hearing sessions were held on April 8 and 9, 1997. Prior to the hearing sessions, the Arbitrators were informed that Weber, Byrne, and Stratton Oakmont had filed for bankruptcy protection, thus, as to those parties, the proceeding was stayed. Also prior to the arbitration, the Arbitrators dismissed the action as against Mathias Tiffert and Leonard Dunn. In addition, although Jordan Shamah did not attend the arbitration, the Arbitrators found that he had been properly served and was therefore subject to the terms of the Award.

The Arbitrators rendered their award after considering the parties' submissions, pleadings, testimony, and evidence presented at the hearing. In finding against Greene and Sanders (Petitioners herein, Respondents below), the Arbitrators acknowledged that Greene and Sanders had no direct contact with Gardner, nonetheless, their culpability was premised upon their participation in the overall business of Stratton.

The Arbitrators unanimous Award decided .in full and final resolution the issues submitted for determination, and provided:

1. Respondents [Petitioners in the case at bar] Daniel M. Porush, Jordan Shamah, Andrew T. Greene and Steven P. Sanders, jointly and severally, are liable to and shall pay Claimant [Gardner, Respondent in the case at bar] compensatory damages in the amount of $184,583.

2. Respondents Daniel M. Porush, Jordan Shamah, Andrew T. Greene and Steven P. Sanders, jointly and severally, are liable to and shall pay Claimant interest at 10% commencing from December 12, 1995 through April 10, 1997, in the amount of $23,375.

3. Respondent Daniel M. Porush is liable to and shall pay Claimant punitive damages in the amount of $4,000,000.

4. Respondent Jordan Shamah is liable to and shall pay Claimant punitive damages in the amount of $2,000,000.

5. Respondent Andrew T. Greene is liable to and shall pay Claimant punitive damages in the amount of $2,000,000.

6. Respondent Steven P. Sanders is liable to and shall pay Claimant punitive damages in the amount of $2,000,000.

7. All punitive damages were made pursuant to the authority presented in Claimant's Arbitration Brief at pages 9–10.

8. Respondent Daniel M. Porush, Jordan Shamah, Andrew T. Greene and Steven P. Sanders, jointly and severally,

are liable to and shall pay Claimant his initial filing fee of $200.

9. Claimant's claim for attorney's fees is denied in its entirety due to a failure of proof.

## IV. PETITIONERS' MOTION TO VACATE THE AWARD

The Petitioners move the Court to vacate and set aside the Award, pursuant to Section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, on the grounds that the Arbitrators exceeded their powers and acted in manifest disregard of the law and otherwise engaged in misconduct: (1) by arbitrarily and capriciously rendering an award as against Sanders and Porush based on an issue not joined or tried at the arbitration hearing; (2) by arbitrarily and capriciously ignoring an affidavit submitted by Shamah prior to the hearing; (3) by arbitrarily and capriciously granting Gardner punitive damages in the amount of $10 million which amounts to fifty times all compensatory damages awarded; (4) by exceeding their authority and imperfectly discharging their obligations by rendering an award as against Sanders, Shamah and Porush, for the full amount of the compensatory damages claimed when there was no evidence to support such an award; (5) by permitting the introduction into evidence of highly prejudicial and inflammatory documents which had no relevance to the issues to be resolved, and which obviously poisoned the arbitrators against Sanders, Shamah and Porush.

Petitioner Andrew T. Greene separately moves to vacate the award asserting, *inter alia*, that he was not liable as a "controlling person" at Stratton as defined under Section 20(a) of the Securities Exchange Act of 1934, and that the Respondent erroneously asserted a claim against him while intending to name Kenneth Greene.

Respondent Gardner moves the Court to confirm the Award, in part, because established precedent requires a court to confirm an arbitration award as a matter of course, absent the most exceptional circumstances, which Respondent asserts were not present herein.

## DISCUSSION

The parties to this case are citizens of different states and invoke this Court's diversity jurisdiction. As the transactions at issue involve interstate commerce, the provisions of the FAA are applicable. *Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 120 (2d Cir.1991).

## I. STANDARD OF REVIEW

■ At the outset, it is necessary to recognize the important development of arbitration throughout the legal landscape and the judicial deference accorded arbitration awards. This is most evident by the wide sweep of applications governed by the Federal Arbitration Act. 9 U.S.C. § 1 *et seq.* Arbitration is not limited to contractual claims, rather, statutory claims, including those arising under the Securities Acts, are clearly arbitrable. *See, e.g., Rodriguez de Quijas v. Shearson/American Express*, 490 U.S. 477, 486, 109 S.Ct. 1917, 1922, 104 L.Ed.2d 526 (1989)(because "resort to the arbitration process does not inherently undermine any of the substantive rights afforded to Petitioners under the Securities Act[s]" of 1933 and 1934, therefore, such claims are arbitrable).

■ The original purpose of the Federal Arbitration Act was to "reverse the long-standing judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements on the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991) (citations omitted); *see also Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270, 115 S.Ct. 834, 838, 130 L.Ed.2d 753 (1995)(FAA was passed to overcome courts' refusals to enforce agreements to arbitrate). Over time, a liberal federal policy has developed favoring arbitration agreements. *See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Once it has been determined that the FAA applies to a particular arbitration agreement, incongruent state statutory schemes are pre-empted. *See Al-*

*lied–Bruce,* 513 U.S. at 272–73, 281, 115 S.Ct. at 839, 843.

■ To satisfy arbitration's twin goals of settling disputes efficiently and avoiding long and expensive litigation, arbitration awards are subject to very limited review. *See Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir.1997). Once an award has been entered, Section 9 of the FAA provides that a court, upon timely application by any party, must issue an order confirming the award unless the award is vacated, modified, or corrected as prescribed in Sections 10 and 11. The grounds on which an award may be vacated are textually limited and narrowly interpreted. Thus, pursuant to Section 10, a court may vacate the award:

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

In addition, pursuant to subsection (5): Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

An award may be modified or corrected by the court upon application of any party to the arbitration, pursuant to Section 11:

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, un-less it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

Finally, the order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties. The foregoing statutory provisions circumscribe a court's review, yet, judicial precedent and legislative intent informs added restraint.

■ There is, however, a doctrine of judicial creation which permits a court to vacate an award if the arbitrators "manifestly disregarded the law" in reaching their decision. *First Options of Chicago Inc. v. Kaplan,* 514 U.S. 938, 941, 115 S.Ct. 1920, 1923, 131 L.Ed.2d 985 (1995); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 935–36 (2d Cir.1986). Because "the reach of the manifest disregard doctrine is severely limited," *DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 821 (2d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 695, 139 L.Ed.2d 639 (1997), an arbitration award will not be vacated simply because of "error or misunderstanding with respect to the law." *International Telepassport Corp. v. USFI, Inc.,* 89 F.3d 82, 85 (2d Cir.1996). Only where the error is "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator ... [and] the arbitrator appreciate[d] the existence of a clearly governing legal principle but decide[d] to ignore or pay no attention to it," will manifest disregard exist. *DiRussa,* 121 F.3d at 821. Therefore, in order to modify or vacate an award on the ground of manifest disregard, the Court "must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators ... [was] well defined, explicit, and clearly applicable to the case." *Id.* (internal citations omitted).

■ To facilitate this intended quick, efficient, and informal means of private dispute settlement, it has long been established that arbitrators are not required to disclose the basis or reasoning upon which their awards

are made. *See, e.g., Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *Kurt Orban Co. v. Angeles Metal Systems*, 573 F.2d 739 (2d Cir. 1978); *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211 (2d Cir.1972); *Maidman v. O'Brien*, 473 F.Supp. 25 (S.D.N.Y.1979). A court, therefore, need only infer from the facts of the case the grounds for the arbitrator's decision, even where tenuous at best. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). The award may be vacated "only for an overt disregard of the law and not merely for an erroneous interpretation." *Folkways Music Publishers Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir.1993). Thus, the Second Circuit has repeatedly held that an award will not be vacated, "even if the arbitrator's interpretation of the contract is clearly erroneous, so long as such Award is explained in terms that offer even a barely colorable justification for the outcome reached." *Hygrade Operators, Inc. v. Local 333 United Marine Div. ILA, AFL–CIO*, 945 F.2d 18, 22 (2d Cir.1991) (citation omitted). Toward that end, the Supreme Court in *Misco*, albeit in the context of a collective bargaining agreement, proclaimed, "[a]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco*, 484 U.S. at 38, 108 S.Ct. at 371. The result is really not in issue, as made clear by the Second Circuit in a recent decision upholding the district court's denial of a motion to vacate an arbitration award, in which Judge Walker stated, "in contracting for arbitration of disputes ... the parties bargained for a decision by the arbitrator, not necessarily a good one, and that is what they received." *St. Mary Home v. Service Employees Int'l Union, Dist. 1199*, 116 F.3d 41, 45 (2d Cir. 1997). Finally, because confirmation of an arbitration award is a "summary proceeding that merely makes what is already a final arbitration award a judgment of the court," *Barbier v. Shearson Lehman Hutton, Inc.*, 752 F.Supp. 151, 158 (S.D.N.Y.1990), *aff'd in part, rev'd in part*, 948 F.2d 117 (2d Cir.1991)(internal citations omitted), the par-

ty moving to avoid summary confirmation and to vacate or modify an award, must make a highly convincing showing, *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987), and "bears a heavy burden of proof." *Folkways Music Publishers*, 989 F.2d at 111. It is against this backdrop that the Court assesses the Petitioners' claims.

## II. APPLYING THE STANDARD TO THE AWARD

As an initial matter, the Court notes that by agreeing to arbitrate, the parties effectively relinquished the right to a court's decision on the merits of the dispute. *See First Options*, 514 U.S. at 941, 115 S.Ct. at 1923. In this posture, it is not the Court's role to decide anew the issues of liability. The Petitioners raise issues which have individual and collective application and they will be addressed in that order. A discussion of punitive damages will follow thereafter.

### A. *Individual Liability*

#### 1. *Steven P. Sanders*

The Petitioners assert that the award against Sanders was rendered in manifest disregard of the law in light of the Arbitrators' statement that "[t]he Panel recognizes that Respondent Greene and Respondent Sanders had no direct contact with the Claimant. The Award against Respondent Greene and Respondent Sanders is premised upon their participation in the overall business of Stratton–Oakmont, Inc." (Arb. Award, Other Issues Considered and Decided). Petitioners attack this statement on three grounds: (1) it was not an issue submitted to arbitration; (2) as a matter of law a finding of personal liability requires a showing of individual culpability; and (3) it is unsupported by the evidence in the record.

As previously noted, arbitrators need not set forth the reasons for their award and the Court may not require them to do so. *Sobel*, 469 F.2d at 1214–15. Where, as here, the arbitrators have provided a possible explanation for their reasoning, it does not change the underlying rule and the Court should not consider such statement as the complete and sole basis for the arbitrators' conclusions,

rather, the question for the Court is whether "no proper basis for the award can be inferred from the facts of the case." *Wall Street Assoc. v. Becker Paribas Inc.*, 27 F.3d 845, 849 (2d Cir.1994).

Sanders was one of the Respondents named in Gardner's first amended statement of claim, in which it was alleged that collectively and individually the Respondents brought about the excessive activity of Gardner's account, breached their fiduciary duties as stock brokers, committed fraud, and violated, *inter alia*, Sections 10 and 20 and rule 10(b)–5 of the Securities and Exchange Act of 1934. (Arb. Amended Claim ¶¶ 5, 27, 30, 34, 40). Thus, Sanders was or should have been aware of his level of involvement and culpability the Claimant was alleging, and therefore Sanders' involvement was a matter properly before the Arbitrators.

The bases upon which the Arbitrators could have determined Sanders' liability stem from relevant documents and testimonial evidence introduced during the hearing. Specifically, Sanders was listed as a Vice President, General Securities Principal, and included within the supervisory personnel in the compliance manual. (Claimant's Ex. B00026, B00028). Sanders was the direct supervisor of Weber, who executed all of Gardner's trades. (Claimant's Ex. B00056 and A935). Sanders was also listed as the principal assigned to carry out Stratton's supervisory and compliance obligations with respect to the business segments designated: (1) Security Rule 15G; (2) Principal Transactions; and (3) Market Making & Order Room. (Claimant's Ex. B00114).

Sanders testified that he was one of the original owners of Stratton Oakmont, in fact, he was "the Oakmont," and he purchased the firm in March of 1988. He sold the firm to Jordan Belfort, Danny Porush, and Kenny Greene in October of 1989, at which time he assumed the role of manager of the trading department, or head trader. (Petitioners' Arbitration Hearing Transcript (hereinafter "Tr.") at 138, 139). Yet, Stratton filed a Schedule E of Form BD, listing Sanders'

home address as a new branch office of Stratton, as of August 18, 1992. (Claimant's Ex. A965). Sanders denied ever holding the title of Vice President, although he had read the aforementioned compliance manual, and purportedly protested his designation as a securities principal with oversight of 50 brokers, although he remained in Stratton's employ. (Tr. at 138, 139, 145).

Sanders' involvement in the trading activities of Weber and his role, if any, in the management of Stratton was in dispute and represented a factual determination resolved by the Arbitrators. Based upon the documentary evidence and the conflicting testimony, there was a proper factual basis upon which the Arbitrators could have found Sanders liable. The Arbitrators were not obliged to articulate the legal theory upon which their determination was made. Once again, whether the Arbitrators properly concluded that Sanders participation constituted control, negligent supervision, fraud, primary or derivative liability, or under another theory of recovery, is not for the Court to second guess. The Court does find, however, that the Arbitrators did not knowingly disregard a well defined and clearly applicable governing law when holding Sanders jointly and severally liable to the Claimant.

### 2. *Andrew T. Greene*

■ Petitioner, Andrew T. Greene, separately moves to vacate the arbitration award based upon the theory of mistaken identity, and, as head of the Corporate Finance department he maintains that he had no connection with, or responsibility for, the trading activities at Stratton. Accordingly, Greene asserts that notwithstanding his position on the Board of Directors, he was not a "control person" as defined within the Securities Acts, and that his designation on Stratton's Form BD as a control person is irrelevant.

Mr. Greene testified to having experience in the securities industry since approximately 1989 and to possessing five securities licenses.[6] (Tr. at 14). Greene's affiliation and

---

**6.** Greene successfully satisfied the requirements and passed the examinations for the following licenses:

(1) Series 22—Direct Participation Program Limited Representative Examination;

employment with Stratton spanned from March 1993 to February 1996. (Tr. at 14). In September 1993, Greene was elevated to Director of Corporate Finance and in the spring of 1994, he became one of the three members of the Board of Directors at Stratton, in which capacity he remained until his resignation in February 1996. (Tr. at 15). In March of 1994, Stratton added Greene on Schedule C of Form BD, as a Director and Secretary and as a "control person,"[7] effective February 1994. (Claimant's Ex. A983).

In addition, Greene was educated in the law, having successfully passed the California Bar examination. (Tr. at 16). Greene further testified that there were no formal Board of Directors meetings, however they met from time to time. The Board was comprised of Andrew T. Greene, Daniel M. Porush, and Jordan Shamah. (Tr. at 17, 18). At the time he agreed to join the Board of Directors, Greene was aware of the ongoing administrative proceedings and investigations involving Stratton, and had read the independent consultant's report, which was attached as an addendum to the compliance manual.[8] (Tr. at 20–21). Greene testified that his sole involvement with the recommendations contained within the Manual was to rely upon

the advice of legal counsel at Stratton and an independent auditor that the recommendations were being implemented. (Tr. at 26). Greene testified that he was aware that the SEC filed for and received a temporary restraining order, followed by a preliminary injunction and subsequently replaced by a permanent injunction for Stratton's deliberate failure to implement the procedures in the Manual within the prescribed time period. (Tr. at 30–33). Greene did not take any action to ensure that the court ordered temporary restraining order, which prohibited certain trading activities, was being disseminated to the brokers and complied with, nor did he see any Stratton documents in furtherance thereof, rather, he relied solely upon Shamah, (Tr. at 33–35), although he was more actively involved once the permanent injunction was ordered. (Tr. at 37).

As Director of Corporate Finance, Greene was involved in and reviewed the prospectuses of new issues Stratton underwrote. (Tr. at 39, 40). Greene's overall involvement as Director of Corporate Finance was further probed during his testimony at the hearing and Greene declared that he could not estimate the number of brokers in the Maryland office and had never seen a profit or loss

(2) Series 6—Investment Company/Variable Contracts Products Limited Representative Qualification Examination;
(3) Series 63—Uniform Securities Agent State Law Examination;
(4) Series 7—General Securities Registered Representative Examination; and
(5) Series 24—General Securities Principal Examination.

7. The instructions for Form BD defines "control person" as an individual, partnership, corporation, or other organization, [having] the power, directly or indirectly, to direct the management or policies of a company, whether through ownership of securities, by contract, or otherwise. Any person that (i) is a director, general partner or officer exercising executive responsibility (or having similar status or functions); (ii) directly or indirectly has the right to vote 25% or more of a class of a voting security or has the power to sell or direct the sale of 25% or more of a class of voting securities; or (iii) in the case of a partnership, has the right to receive upon dissolution, or has contributed, 25% of more of the capital, is presumed to control that company. (This definition is used solely for purposes of form BD). From the information available, it is reasonable to conclude that Greene's eligibility as a "control person" was under subsection (i), as a director

exercising executive responsibility, or having similar status or functions.

8. Pursuant to a prior consent decree, Stratton agreed to the appointment of a special master and was assessed a fine. In addition, an independent consultant was appointed to recommend mandatory changes to the entire operation of Stratton. (Tr. at 19). The independent consultant also prepared a Compliance and Supervisory Procedures Manual (the "Manual"), with which Stratton was obligated to comply. (Claimant's Ex. B00490). Included within the Manual was a Summary of Obligations and Prohibited Activities, (Claimant's Ex. B00495), and a description of abusive Sales Practices which were strictly forbidden. (Claimant's Ex. B00508). These prohibited sales practices included: "(1) unauthorized purchases; (2) refusals to execute explicit sell instructions; (3) being overly aggressive in recommending "house" stocks (*i.e.*, stocks in which Stratton makes a market); (4) verbally dominating and intimidating customers; (5) making price predictions; and (6) using unfair or misleading comparisons and untrue statements of fact to convince a customer to purchase a security." *Id.*

statement for Stratton. (Tr. at 44). Greene described his function as Director of Corporate Finance as involving interaction with the issuers, their counsel, and the underwriter's counsel. He would review business plans and interact with the companies and the regulators in the registration of their offers, acting as an observer and keeping records for the underwriting department. (Tr. at 46). Finally, Greene summarily testified to having no responsibility in his capacity as head of corporate finance over the sales force, the trading room or the compliance department. (Tr. at 50).

As an initial point, Petitioner Greene alleges that Claimant Gardner asserted a claim against Andrew T. Greene in error, intending instead to assert a claim against Kenneth Greene. In support of this contention, Petitioner Greene refers to Claimant's counsel's stipulation that he was confused as to the difference between Andrew T. Greene and Kenneth Greene during Petitioner Greene's questioning. (Tr. at 57). A review of the transcript reveals that this error occurred during two consecutive questions at the end of Greene's testimony. Kenneth Greene was described by Andrew T. Greene as unrelated, and someone who owned the firm prior to his arrival at Stratton. (Tr. at 56). In addition, Claimant Gardner, when queried as to whom Kenneth Greene was, testified that he thought he was a 20% owner of Stratton and believed him to be the person he thought was named in the lawsuit. (Tr. at 111). Gardner acknowledged that Weber did not mention names, but had led Gardner to believe that the people who ran the corporate structure made the price predictions of the stocks being discussed. (Tr. at 112).

Petitioner Greene's claim of mistaken identity is legally deficient. This is not an instance where the testimony and documents introduced into evidence referred to a party not before the arbitration panel while the named party was an innocuous unrelated individual. The panel made a determination as to the liability of Andrew T. Greene, based entirely on evidence and testimony pertaining to Andrew T. Greene. The fact that Kenneth Greene's name can be found in documents produced during discovery and that

the Claimant may have believed him to be a named party, does not undermine the Arbitrator's decision. Moreover, the testimony elicited revealed that Kenneth Greene's involvement with Stratton preceded Andrew T. Greene's, and Andrew was already in place as Director of Corporate Finance and as a member of Stratton's Board of Directors prior to Weber's first contacts with Claimant Gardner, in November 1994. Therefore, if Kenneth Greene was the named defendant, the claim against him would have been readily dismissed, absent a showing that Kenneth Greene assumed responsibility for the liabilities of Stratton after his departure.

Petitioner Greene's main assertion in support of his motion to vacate, is that the award was issued in manifest disregard of the law. In support, Greene contends that his participation at Stratton did not warrant the imposition of "control person" liability.

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), provides:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

"This provision imposes secondary liability under the Exchange Act on so-called 'controlling persons' of entities in violation of the Act who fail to show that they acted in 'good faith.'" *Food & Allied Serv. Trades Dep't v. Millfeld Trading Co., Inc.*, 841 F.Supp. 1386 (S.D.N.Y.1994). The SEC defines a control person as one having "the possession, direct[ly] or indirect[ly], of the power to direct or cause the direction of management and policies of a person, whether through the ownership of voting securities or otherwise." 17 C.F.R. §§ 240.12b–2 (1934 Act), 230.405 (1933 Act).

Petitioner correctly indicates that director status alone does not establish control person liability. *See In re Par Pharmaceutical, Inc. Securities Litigation*, 733 F.Supp. 668

(S.D.N.Y.1990); *see also Morse v. Weingarten,* 777 F.Supp. 312, 318 (S.D.N.Y.1991)(allegations that underwriter exercised control over corporation's investments fail to state a claim for control person liability absent allegations identifying any position or title that underwriter held at corporation or any meetings which underwriter attended or conversations which he had with any of the corporation's officers); *Hemming v. Alfin Fragrances, Inc.,* 690 F.Supp. 239, 245 (S.D.N.Y.1988)("A person's status as an officer, director, or shareholder, absent more, is not enough to trigger liability under § 20."). There must be a heightened showing requiring "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973).

Having only established that Greene was a director and was designated as a control person on Schedule C of Form BD, Petitioner avers that Claimant's evidence presented at the hearing was deficient as a matter of law in establishing "control person" liability. This conclusion is misguided, and fails to establish that the Arbitrators' Award was decided with manifest disregard of the law. The Award must be evaluated in the context of Stratton's activities and Greene's involvement and knowledge therein.

Greene commenced his employment at Stratton as a holder of five securities licenses, a Juris Doctor degree, and approximately four years experience in the securities field. Meanwhile, by March of 1993, Stratton's exploits were renowned throughout the industry. Unfortunately, this classic "boiler room" operation was still an unknown commodity for Dr. Gardner and numerous other unsuspecting investors. Greene, however, cannot profess a similar naivete. As indicated above, Greene was aware of the ongoing investigations and consent decrees to which Stratton was a party. As one of Stratton's three members of the Board of Directors, Greene's purported ignorance of the inner workings of this brokerage house could easily have been perceived by the Arbitrators as an unabashed mendacity. This is especially so because Greene was personally involved in the underwriting of new issues and Stratton

was repeatedly criticized for its profit margins and control of the market for these stocks. Moreover, actual control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof. *See Epstein v. Haas Securities Corp.,* 731 F.Supp. 1166, 1175 n. 5 (S.D.N.Y. 1990); *see also In Re JWP Inc. Securities Litigation,* 928 F.Supp. 1239, 1259–60 (S.D.N.Y.1996)(audit committee which exercised oversight of the independent auditor and reported to the Board of Directors had authority to exercise sufficient control). Whether control person liability should be imposed upon Greene is a question of fact. The applicable legal standard varies without and within the circuits and the good faith defense is also steeped in factual inquiry. Because errors of law and fact are not grounds for vacating an arbitral award, *Siegel v. Titan Indus. Corp.,* 779 F.2d 891, 893 (2d Cir.1985), and because Petitioner Greene has failed to prove that the arbitrators were aware of a clearly governing legal principle and consciously decided to ignore it, *see id.* at 893, a showing of manifest disregard has not been made. *See, e.g. Padgett v. Dapelo,* 791 F.Supp. 438, 441 (S.D.N.Y.1992)(confirming arbitration award holding directors of brokerage firm liable as control persons for securities violations). In addition, as discussed *supra* with respect to Sanders, the Arbitrators might have decided Greene's culpability on other grounds, including fraud, breach of fiduciary duty, aiding and abetting, and other bases for primary or derivative liability based upon his overall participation in Stratton. Having found that there is more than a barely colorable justification for the outcome reached, the Court need not pass judgment on the viability of alternative theories of recovery.

### 3. *Daniel M. Porush*

Porush raises much the same claims as the other Petitioners. Specifically, he asserts that the only basis upon which the Arbitrators could have determined his liability is as a control person. The analysis of the claims asserted as against all Petitioners, ripe for arbitration, as described *supra,* and the legal analysis for "control person" liability will not, for the sake of brevity, be re-

peated. Porush defends against such liability based upon his lack of knowledge of both Gardner's account and his connection with Weber. Understandably, Porush and the other Petitioners attempt to separate themselves from their past. Porush suggests his absence of contact with Gardner and the firms discontinuance as a going concern, rendering it an easy target, compels the conclusion that his conduct could not even be loosely characterized as reprehensible, and therefore the punitive damages awarded shocks the conscience. Such claims of benign innocence and individual unawareness on Porush's behalf strain credulity in light of the following information contained in the exhibits. As Porush declined to testify at the Arbitration hearing, adverse inferences may be drawn and his record must speak for itself. Thus, without belaboring the issue, a review of Porush's involvement in Stratton is called for, and of course, where applicable, this will provide a further glimpse into the other Petitioners' level of participation. Porush was listed on Schedule A of Form BD as a Director and Vice President with a 10%—25% ownership share of Stratton as of March 1990, (Claimant's Ex. A981), and a 5%—10% ownership share as Director and Vice President dating back to October 1989. (Claimant's Ex. A970). Beginning in February 1996, Porush was a Director, President and Treasurer with an ownership share in excess of 75%.

Claimant's two voluminous Exhibit Binders, placed into evidence at the Arbitration Hearings contain, among other items, SEC and NASD printouts of Stratton's history of allegations, violations, arbitrations, decisions, fines, etc., far too numerous to recite. The complaints raised against Stratton and its principals, throughout the litany of claims, resonate a familiar pattern. Allegations of churning, unauthorized trading, omission of facts, suitability of the securities, failure to supervise, breach of fiduciary duty, misrepresentation, fraud, and manipulation arise over and over again, many during Gardner's thirteen month period of account activity. One such example was the complaint filed in the Southern District of New York on or about March 1992. The complaint[9] alleged violations of the anti-fraud provisions of the federal securities laws and resulted in a settlement including censure, fine, and individual suspensions and penalties. A review conducted by the SEC for the period June 1993 through April 1994, resulting in a complaint filed June 6, 1996, thoroughly explicates the conduct, culpability and control of the named members.[10]

---

**9.** The complaint specifically alleged "since March 1989, Stratton, under the direction and supervision of Belfort, Greene, and Porush, has operated a boiler room, using high pressure and fraudulent sales practices to sell speculative over-the-counter securities of unseasoned companies to the investing public. The complaint also alleges that Stratton earned approximately $11,-000,000 in connection with its manipulation of the market for Nova Capital, Inc. common stock.... The Commission accepted the offers of settlement of Stratton Oakmont, Inc., Jordan Belfort, Kenneth Greene and Daniel Porush, Stratton will pay disgorgement of $1,537,146 plus prejudgment interest of $518,622, to be used to compensate Stratton customers, and civil penalties of $500,000. Further, Stratton consented to an order that censures Stratton and orders it to comply with certain remedial undertakings.... Porush consented to an order that suspends him from association in a supervisory capacity with certain commission regulated entities for a period of 12 months and orders him to pay a penalty of $100,000." (Claimant's Ex. A809, 810).

**10.** The complaint against respondent member (Stratton), Porush, Sanders, Shamah, and Stit-sky, alleging violations of Article III, Sections 1, 4, 18, and 27 of the Rules of Fair Practice and Section 10(b) of the Securities and Exchange Act of 1934 and Rules 10b–5 and 10b–6 thereunder in that respondent member, acting through respondents Porush and Sanders, during the period June 1993 through April 1994 (the review period), engaged in, and induced others to engage in: a) the use of manipulative and deceptive devices and fraudulent schemes to defraud; b) the use of untrue statements of material fact and the omission to state material facts necessary to make statements made, in light of the circumstances, not misleading; and c) acts, practices, or courses of business which operate as a fraud or deceit upon persons in connection with the purchase and sale of securities of five issuers, respondents member, Porush, and Sanders also failed to observe high standards of commercial honor and just and equitable principles of trade in connection with the firms' purchase and sale of the securities of five issuers. Such manipulative, fraudulent and deceptive acts by respondent member, through respondents Porush and Sanders, include a pattern and practice of activity in the securities of five issuers including: a) the sale of large quan-

tities of securities in initial public offerings to certain customers with prearrangement that such customers would sell or flip the securities back to respondent member at a predetermined price in the immediate aftermarket; b) the bidding on purchasing for a proprietary account of respondent member in the securities of five issuers prior to respondent member completing its distribution to public investors; and c) prior to the close of each of the five offerings, preselling the aftermarket in these securities by soliciting customers to buy in the aftermarket as a condition of obtaining allocations in the IPO. These securities include the units and components issued by Computer Marketplace, Inc., Master Glazier Karate International, Inc., Steve Madden, Ltd., M.H. Myerson & Co., Inc., and IDM Environmental Corp. during the review period. Through manipulative, fraudulent and deceptive acts, respondent member, acting through respondents Porush and Sanders, realized aggregate illegal profits of approximately $28,000,000 during just the first day of aftermarket trading in the securities of each of five issuers; during each of five public offerings respondent member sold to its own customers between 58 and 90 percent of the total distribution. During the offering, respondent member, acting through respondents Porush and Sanders, placed between 41 and 55 percent of respondent members total allocation into customer accounts in which they either simultaneously with confirmation of indications of interest arranged with those customers to sell, or reasonably believed would sell its offering units to respondent member at predetermined prices in the immediate aftermarket trading of the security. Respondent member, acting through respondents Porush and Sanders, knew or reasonably should have known that these customers were going to sell their IPO units to respondent member at predetermined prices, both through such prearrangement with such accounts, and as evidenced by the trading of each offering and by the pattern of trading in these offerings. Respondents Porush and Sanders were thus aware, or reasonably should have been aware, that these customers did not have bona fide investment intent and did not constitute the investing public for purposes of completing a bona fide public distribution of such securities. The customers were predominately accounts for which either respondent Porush or the firms prior Chief Executive Officer, were the account executives. In each of the offerings, respondent Porush received the largest IPO allocation at respondent member. The prior chief executive officer received the second largest allocation at respondent member. Before the opening of the market for each of the five offerings, respondent Porush, directly, or with the assistance of others, prepared sell order tickets for customer accounts to sell the units of the offering back to respondent member that had been sold to them. Sell orders for some of the customers were arranged by respondent Porush or his assistants at the same time that the firm confirmed indications of interest for the customers to buy in the

offering. These sell orders from the customers were entered into the firms trading system prior to the start of aftermarket trading in each of the five IPOs. In each of the five offerings, respondent Sanders executed these sell orders at a premium of approximately $.375 to $2 above the public offering price of $4 immediately at the commencement of aftermarket trading or within the first seven minutes of aftermarket trading. The pattern by these customers of selling immediately at those premiums occurred despite the fact that the price of the units increased to $8—$9, double the public offering price or higher, within four minutes of the opening of trading for each of five offerings. As a consequence of this prearrangement with the customers, respondent member, acting through respondents Porush and Sanders, purchased 41 to 55 percent of respondent members allocation from the customers within the first seven minutes of aftermarket trading. The securities that the customers sold to respondent member in the immediate aftermarket were purchased by respondent member, through respondent Sanders, into the firms proprietary account. These securities were then used to cover the firms sale of the components of the unit offering to retail customers in the immediate aftermarket, for each of the five offerings, respondent member, acting through respondent Porush and others, either directly or through associated persons acting at the direction of respondents member and Porush, solicited customers prior to the effective date of the offering, to purchase securities of the issuer in aftermarket trading. Prior to the close of the five offerings, respondent member informed numerous retail customers, other than customers of respondent Porush and the prior chief executive officer, that customers were required to commit to purchase common stock or warrants in the aftermarket in order to purchase in the underwriting. As a result of such conditioning of IPO allocations to customers during the IPOs, the customers who purchased units in the five offerings accounted for 83 to 95 percent of all common stock sold by respondent member on the first day of aftermarket trading. Such instructions to customers by respondent member's registered representatives constituted misrepresentations of material fact relating to the terms of each of the offerings, and of the customers true obligations under the federal securities laws. Requiring customers to enter into such an agreement constitutes manipulative, deceptive, and fraudulent acts. The manipulative, deceptive and fraudulent actions by respondent member, through respondents Porush and Sanders constituted an intentional interference with the free forces of supply and demand for the securities of each of these issuers. Respondent member, acting through respondents Porush, Sanders, Stitsky, and Shamah, engaged in, and induced others to engage in: a) the use of a manipulative and fraudulent scheme to defraud; and b) the bidding for or purchasing for a proprietary account of respondent member of Steven Madden common stock

Gardner, meanwhile, purchased his first shares of stock through Stratton on or about November 17, 1994. Only one month later, the SEC filed a complaint against Stratton, in the United States District Court for the District of Columbia, and was granted a temporary restraining order enjoining Stratton from violating an order issued by the SEC on March 17, 1994, in settlement of fraud charges, and a special compliance monitor was appointed. The District Court was so convinced of Stratton's continued wrongdoing that on January 11, 1995, it issued a preliminary injunction for Stratton's violation of the TRO, finding:

"the practices of Stratton are highly dangerous to the interests of the investing public and cannot be permitted to continue.... Indeed, the harm to the investing public if Stratton is not required to comply with the report remains sufficiently severe

prior to respondent members completion of its participation in the distribution of such securities from the selling security holders; respondent member, acting through respondents Porush, Stitsky, and Shamah, directly, or indirectly solicited customers to purchase Steven Madden common stock that was to be sold by selling security holders; respondent member, acting through respondents Porush, Sanders, Stitsky and Shamah, placed 30 percent of the shares being sold by selling security holders into customer accounts that they prearranged to have sell or reasonably believed would sell its shares to respondent member at a small, predetermined profit in the immediate aftermarket trading of the security; since respondent member, acting through respondents Porush, Sanders, Stitsky, and Shamah prearranged to sell or reasonably believed that these customers were going to sell their Steven Madden common stock in the immediate aftermarket to respondent member at predetermined prices, these customers did not constitute the investing public for purposes of completing a bona fide public distribution of such securities by respondents member, Porush, Sanders, Stitsky and Shamah; respondent member, acting through respondent Sanders, purchased 332,304 shares of Steven Madden common stock from customers within the first minute of the open of trading at $5/share, a $1 premium to the price in which it was sold to them; respondent member purchased Steven Madden common stock on a proprietary basis from customers and thereafter sold those shares to public customers at significantly higher prices; respondent member, acting through respondents Porush and Sanders, engaged in manipulative, deceptive and other fraudulent devices in connection with Steven Madden common stock. Prior to the start of aftermarket trading in Steven Madden common stock, respondent member, acting through respondents Porush and Sanders, arranged for both a supply and demand of the stock to be available to respondent members trading department at the time Steven Madden common stock began aftermarket trading which allowed respondent member to manipulate the security while engaging in riskless principal transactions; respondent member, acting through respondents Porush and Sanders, engaged in the purchased sale of securities at arbitrary prices, not related to prices set by the markets true supply and demand; while dominating and controlling Steven Madden common stock and positioned to engage in such arbitrary pricing of the security, respondent member, acting through respondents Porush and Sanders, upticked the inside bid of the Steven Madden common stock six times to the exclusive high bid. Respondent members upticked its own exclusive inside bid on three of the six upticks. As a consequence, respondent member either had the exclusive high bid or shared the high bid for 99.4 percent of the market time and resulted in illegal profits of $5.2 million; respondent member, acting through respondent Sanders, effected transactions in, and induced others to effect transactions in a Steven Madden warrants at prices which were unfair in that they were not reasonably related to the prevailing market price of those securities; engaged in, and induced others to engage in, fraudulent and deceptive devices and contrivances in connection with the charging of excessive markups in the sale of Steven Madden warrants; failed to observe high standards of commercial honor, and just and equitable principles of trade in connection with the firms sales of Steven Madden warrants to its customers at unfair and fraudulently excessive prices; dominated and controlled the market for Steven Madden warrants such that there were no independent, competitive market in those securities; charged its retail customers fraudulently excessive markups in 41 transactions which ranged from 10 to 71.43 percent over the prevailing market price; respondent member, acting through respondent Porush, allocated units in five offerings to customers who were restricted from purchasing such securities at respondent member [Stratton Oakmont] pursuant to the NASD free-riding and withholding interpretation; respondents member, Porush and Stitsky failed to adequately supervise the firms trading activity, specifically with respect to the firms failure to complete bona fide distributions of securities, the manipulation of securities, and the charging of fraudulently excessive markups, and failed to supervise the retail sales force in their making material misrepresentations and omissions to customers and the sale of hot issue offerings to restricted accounts; and, respondents member and Porush, failed to establish and maintain reasonable supervisory procedures to prevent the firm's violative conduct. (Claimant's Ex. A775–A781).

to warrant continued court intervention at this preliminary stage because these matters so seriously impact the public interest, and because Stratton failed to comply with the TRO, it is critically important that a preliminary injunction be issued to order Stratton to comply with the report."
(Claimant's Ex. A803, 804). On February 28, 1995, the court issued a permanent injunction after Stratton admitted it had not complied with the preliminary injunction. (Claimant's Ex. A805). On March 22, 1995, the Delaware Securities Commission found it in the public interest to summarily suspended Stratton's broker-dealer license. (Claimant's Ex. A800).

On April 4, 1995, the Indiana Securities Division entered a summary order suspending the broker-dealer registration of Stratton, based on an administrative complaint alleging that Stratton (1) engaged in dishonest and unethical practices, (2) has been enjoined by a court of competent jurisdiction, and (3) has been the subject of a determination by the SEC to have willfully violated federal securities laws. (Claimant's Ex. A799). By October 5, 1995, the SEC filed another complaint [11] against Stratton, Sanders and Porush which ultimately resulted in Porush and Stratton's expulsion from NASD membership. In a contemporaneous interview, Mary Schapiro, president of the enforcement arm of the NASD, described the expulsion and stated that Stratton, the subject of 12 previous NASD regulatory actions since 1989, with two pending, "has time after time shown entire disregard of customers, the integrity of the marketplace, and its responsibilities as a broker-dealer, . . . and that Stratton and Porush and Sanders (also expelled), pose an ongoing risk to the investing public." The decision expelling Stratton found that the number and gravity of the firm's disciplinary incidents, combined with the specific allegations it was acting on, establishes a coherent pattern of willful disregard for regulatory requirements and regulatory authority, as well as a failure of lesser steps to remediate the firm's conduct. (Newsday, December 6, 1996). (See also Claimants Exhibits tabbed at B4 through B17 and the administrative hearings, claims, decisions and settlements, etc., contained therein).

Nor can Porush or others claim this was Weber's first problem with a customer, as numerous complaints had been previously initiated raising substantially similar allegations against Weber. (Claimant's Ex. A749–A757).

As is often the case, numerous individual losses often create substantial gains for a few. Testifying before the Senate Governmental Affairs Committee, Joseph Borg, Director of the Alabama Securities Commission discussed the abuses of unscrupulous broker-dealers and described the findings of a nine

---

11. The complaint alleged violations of Article III, Sections 1, 14, 18, and 27 of the Rules of Fair Practice in that respondent member, acting through respondent Sanders, effected transactions in, and induced others to effect transactions in stock at prices that were unfair in that they were not reasonably related to the prevailing market price of those securities; engaged in, and induced others to engage in, fraudulent and deceptive devices and contrivances in connection with the charging of excessive markups in the sale of stock; failed to observe high standards of commercial honor, and just and equitable principles of trade in connections with the firm's sales of stock to its customers at unfair and fraudulently excessive prices; dominated and controlled the market for the securities such that there was no independent, competitive market in those securities; charged its retail customers fraudulently excessive markups ranging from 5.56 to 33.33 percent over the prevailing market price; respondents member, Porush and Byrne failed to establish, maintain, and enforce reasonable supervisory procedures to prevent the firm's retail customers from being charged excessive and fraudulently excessive markups in purchases. Decision rendered April 15, 1996, wherein respondent member is censured, fined $500,000, required to disgorge its excess profits totaling $1,876,205 to its customers, plus prejudgment interest, and suspended from effecting any principal retail transactions for one year; respondent Sanders is censured, fined $25,000, suspended from association with any NASD member in any capacity for one year, and at the end of the suspension, required to requalify as a General Securities Representative and a General Securities Principal; respondent Porush is censured, fined $250,000 and barred from association with any NASD member in any capacity; and respondents member, Sanders and Porush are assessed costs of $4,180, jointly and severally. This decision was appealed and affirmed as modified to the extent that Stratton's disgorgement in the form of restitution was modified to $416,528.77. (Claimant's Ex. A786, 787, 788).

state, two year investigation into Stratton. The investigation centered around five initial public offerings ("IPOs"), two of which, Dual Star Technologies and Solomon Page Group Limited, Stratton sold to Gardner. Belfort, a prior principal in Stratton who was barred from association with any broker-dealer, participated in these IPOs through Porush. Belfort and Porush, the investigation revealed, would purchase the private placement shares, benefitting from stock splits prior to the IPOs, and accumulating a high percentage of ownership. Often NASDAQ would refuse to list the stock due to the high ownership percentage, leading Belfort and Porush to sell their shares to newly formed shell companies owned by friends in return for sizable promissory notes. As an example, Porush, Belfort and Kenneth Greene received promissory notes for over eleven million dollars from three of the five IPOs. Through stock manipulation and a pattern of bridge loans and private placements participated in by close friends and relatives, the three were able to convert a $100,000 convertible debenture into shares of a private placement which was later sold to Stratton clients netting over five million dollars. As another example, of the $12,500,000 generated by the initial public offering of Steve Madden Limited, and intended for the company, approximately $11,000,000 went to these insiders. Mr. Borg went on to describe Stratton as "probably the worst of the worst." (As reported in the Federal News Service, Sept. 22, 1997).

A finding of individual liability by the Arbitrators as against Daniel Porush is fully supported by the evidence under numerous theories of recovery. Clearly, he was at the forefront of the manipulative schemes which substantially contributed to Gardner's losses. Unequivocally, he was a control person at Stratton. The Arbitrators' correctly determined that Porush was liable to Gardner.

### 4. *Jordan Shamah*

■ Petitioner Jordan Shamah moves to vacate the Award on the ground that he was not given proper notice of the arbitration proceeding as required by the applicable regulations. Shamah admits to receiving a letter, dated February 11, 1997, from the NASD via regular mail, stating that the hearing of the arbitration was to be held on April 8 through April 11, 1997. (Shamah Cross–Motion to Vacate Ex. F). Shamah maintains that this was the sole notification he received from NASD of the hearing. Shamah failed to attend the hearing, either in person or by telephone.

However, based upon receipt of the letter, Shamah did file an affidavit, on or about April 2, 1997, and prior to the hearing, denying all material allegations of the Statement of Claim. (*Id.* Ex. G). The affidavit admits knowledge of the hearing and asserts a denial of all claims against him. Shamah's affidavit provides in relevant part:

"As a result of the demise of Stratton, I am in a distressed financial condition. I am unable to retain counsel to represent me in this matter and cannot afford the expenses associated with attending the arbitration proceedings in Los Angeles in a *pro se* capacity. Given my current financial condition, it is highly unlikely that I will be able to pay ·any award that is rendered against me. I will make every effort to make myself available to testify telephonically in this matter, however, due to my current financial circumstances, I will be unable to afford to travel to Los Angeles and incur travel, lodging and miscellaneous expenses."

Noteworthy, Shamah's affidavit did not challenge the notice, or mention its purported infirmities. Shamah did not indicate in the letter how he had intended to make himself available to testify telephonically, and he did not even include a phone number where he could be reached. Yet, based on the failure to receive proper notice of the hearing, Shamah now moves to vacate the Award alleging that the Arbitrators acted in manifest disregard of the law and engaged in misconduct by arbitrarily ignoring his affidavit and exceeded their authority by rendering an award against Shamah, and that the Award against Shamah is unsupported by the evidence.

■ An arbitration award may be vacated on the grounds that "the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4).

The proper inquiry for the Court is to "determine first whether the arbitrator acted within the scope of his authority, and second whether the award draws its essence from the agreement or is merely an example of the arbitrator's own brand of justice." *Local 1199, Drug, Hosp. & Health Care Employees Union v. Brooks Drug Co.*, 956 F.2d 22, 25 (2d Cir.1992). The "scope of authority of arbitrators generally depends on the intention of the parties to an arbitration, and is determined by the agreement or submission." *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir.1987).

Shamah did execute a Submission Agreement on June 18, 1996, agreeing to arbitrate Gardner's claim. (*Id.* Ex. E). Further, Shamah's present counsel submitted a Statement of Answer to Gardner's claim, on or about July 12, 1996, on behalf of Shamah and the other initially named Respondents (Petitioners herein). (*Id.* Ex. D). The controversy was properly before the Arbitrators and Shamah was legally bound by the authority of the Arbitrators to render a decision.

It was specifically noted that "[a]lthough Respondent Jordan Shamah did not attend the arbitration, the Arbitration Panel found that Respondent Jordan Shamah had been properly served with notice of the arbitration filed against him as well as the time, date and location of the scheduled hearing." (Arb. Award, Other Issues Considered and Decided).

The NASD Code of Arbitration Procedure, Section 10318, provides:

> If any of the parties, after due notice, fails to appear at a hearing or at any continuation of a hearing session, the arbitrators may, in their discretion, proceed with the arbitration of the controversy. In such cases, all awards shall be rendered as if each party has entered an appearance in the matter submitted.

The provision designating the time and place of the hearing, NASD Code of Arbitration Procedure, Section 10315, provides:

> The time and place of the initial hearing shall be determined by the Director of Arbitration and each hearing thereafter by the arbitrators. Notice of the time and place for the initial hearing shall be given at least eight (8) business days prior to the date fixed for the hearing by personal service, registered or certified mail to each of the parties unless the parties shall, by their mutual consent, waive the notice provisions under this Rule. Notice for each hearing thereafter shall be given as the arbitrators may determine. Attendance at a hearing waives notice thereof.

The Court, as described *supra*, must grant an order confirming the arbitration award unless the award is vacated, modified, or corrected pursuant to the specifically enumerated grounds as prescribed in Sections 10 and 11 of the FAA. In light of the compelling policy reasons favoring arbitration and Shamah's affirmative submission of the claim to arbitration and answer thereto, along with Shamah's actual timely receipt of the notice of hearing, the Court will not overturn the Award based upon a technical procedural irregularity. *See, e.g. Gingiss Intern., Inc. v. Bormet*, 58 F.3d 328, 332 (7th Cir.1995)("Inadequate notice is not one of [the statutory] grounds" for vacating an arbitration award); *Bernstein Seawell & Kove v. Bosarge*, 813 F.2d 726, 729–30 (5th Cir.1987)(party did not receive the arbitration notice but received constructive notice of hearing, the court affirmed the confirmation of the arbitration award finding "due process is not violated if the hearing proceeds in the absence of one of the parties when that party's absence is the result of his decision not to attend"); *Merrill Lynch, Pierce, Fenner & Smith v. Lecopulos*, 553 F.2d 842, 845 (2d Cir.1977)("no unfairness results from giving effect to the notice they actually received") *Borop v. Toluca Pacific Securities Corp.*, No. 97–C–4591, 1997 WL 790588, at *2 n. 7 (N.D.Ill.Dec.17, 1997)("Absent fraudulent or improper conduct, defective notice cannot justify an order vacating an arbitration award under Section 10 of the FAA. 9 U.S.C. § 10. Thus, any defects in notice here do not provide justification for an order vacating the arbitration award."); *Matter of Lauritzen Kosan Tankers (Chemical Trading Inc.)*, 903 F.Supp. 635, 637 (S.D.N.Y.1995)(confirming award where party failed to receive proper notice but received actual notice through its attorney); *In Matter of Arbitration Between In-*

*terCarbon Bermuda, Ltd. and Caltex Trading and Transp. Corp.*, 146 F.R.D. 64, 68 (S.D.N.Y.1993)("defects in service of process may nevertheless be excused where considerations of fairness so require, at least in cases that arise pursuant to arbitration proceedings"); *Geotech Lizenz AG v. Evergreen Systems, Inc.*, 697 F.Supp. 1248, 1253 (E.D.N.Y.1988)(enforcing arbitration award where notice was provided but party chose not to attend arbitration because of costs and inconvenience). Shamah received actual notice and was not prejudiced by lack of notice via registered or certified mail. Such defect does not fall within the enumerated grounds for vacating the award.

In addition, even if Shamah had participated in the hearing, there is nothing alleged in Shamah's memoranda of law supporting his motion to vacate the award that distinguishes his participation in Stratton from the other Petitioners, and the documents introduced into evidence at the hearing fully support the Arbitrators' findings. Shamah was one of the three members of the Board of Directors, along with Petitioners' Greene and Porush. Testimony was also introduced indicating that Shamah was one of the Series 24 Supervisors in charge of the brokers and retail sales. Shamah was also listed as a Director and Vice President and control person on Schedule C of Form BD (Claimant's Ex. A983). Shamah's participation is also noted throughout, in the previously cited material. Once again, the Court concludes that there was more than a colorable justification for finding Shamah liable to Gardner.

### B. *Collective Liability*

What can be gleaned from Stratton's history is a pattern of pervasive violative trading practices designed to maximize individual gain at the expense of the unwitting investors, oftentimes in the face of censure and rebuke, and after January 11, 1995, in complete disregard of the SEC Order and the district court ordered injunctions. These were not isolated trades executed by a renegade broker named Weber. Stratton's sales pitches were scripted, (Claimant's Ex. A252), earmarked stocks were promoted at the expense of all others, the timing of trades was executed with precision, and the customers were maneuvered en masse, all to manipulate an issue's market for the aggrandizement of Petitioners' bottom line. It is clear that Petitioners Porush, Sanders and Shamah were instrumental in these nefarious endeavors. If nothing else, they were principals without principles. Although Andrew T. Greene's role may be less readily apparent, as Director of Corporate Finance in this securities machination, his culpability is no less defined. The Court finds that there is a "colorable justification" for the Arbitrators' finding of joint and several liability against Petitioners Sanders, Greene, Porush, and Shamah.

Finally, all other issues and claims raised by the Petitioners are insufficient to establish a manifest disregard of the law or any other cognizable basis upon which the Award should be corrected, modified, or vacated, and therefore, need not be discussed herein.

### III. PUNITIVE DAMAGES

 The heart of Petitioners' objections to the Award is the punitive damages component of $10,000,000, an amount more than 50 times the compensatory damage award of approximately $184,000. Petitioners' attack this component of the Award on numerous grounds. These arguments—although intellectually provocative and steeped in policy considerations—do not comport with established precedent.[12]

Any discussion of punitive damages in the context of an arbitration award must begin with the Supreme Court's recent decision in *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), and in light of the factual similarity

---

12. The parties have provided the Court with articles, including those authored by Petitioners' attorneys, commenting on the *Mastrobuono* opinion. While the content may represent the authors' honest assessment that punitive damages have no role in private arbitration, these articles, written after the instant arbitration award, appear as self-serving attempts to buttress Petitioners' position, while advancing the broker/dealer clients they represent. Although the discussion does provide interesting fodder for academic exegesis and law review articles, the Court is circumscribed by precedent as *Mastrobuono* is "on all fours."

with the case at bar, this discussion, must also end there.[13] Petitioner Mastrobuono opened an account with respondent Shearson, and executed a standard form client agreement. After the account was closed, petitioner initiated suit in district court alleging a mishandling of the account by respondent. The agreement contained an arbitration provision and a choice-of-law provision. *Id.,* 514 U.S. at 54, 115 S.Ct. 1212.

The respondents successfully stayed the court proceeding and compelled arbitration pursuant to the rules of the National Association of Securities Dealers ("NASD"). A panel of arbitrators awarded compensatory damages and punitive damages, notwithstanding respondent's assertions that the arbitrators had no authority to award punitive damages. *Id.* The respondents successfully moved the district court to vacate the punitive damages component of the arbitration award and the Seventh Circuit affirmed. 20 F.3d 713 (7th Cir.1994). The Seventh Circuit, as did the court below, predicated its decision on the choice-of-law provision in the agreement which specified that the contract shall be governed by New York law, and the New York Court of Appeals' unequivocal pronouncement in *Garrity v. Lyle Stuart, Inc.,* 40 N.Y.2d 354, 386 N.Y.S.2d 831, 353 N.E.2d 793 (1976) that in New York, the power to award punitive damages is limited to judicial tribunals and may not be exercised by arbitrators. *Mastrobuono,* 514 U.S. at 54, 115 S.Ct. 1212.

The Supreme Court granted certiorari to decide whether a contractual choice-of-law provision may preclude an arbitral award of punitive damages that otherwise would be proper. *Id.* In *Mastrobuono,* the Court analyzed its prior arbitration decisions as they pertain to the right of parties to structure arbitration agreements as they so desire. The Court distinguished between arbitration agreements which generally foster arbitration, *see Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488

(1989)(agreement providing for application of California rules of arbitration in place of FAA rules was upheld), and the case before it which contained provisions that could intrude upon the province of the arbitrator.

Turning to the specific language of the agreement, the Court analyzed the two ostensibly inconsistent clauses; the New York choice-of-law provision and the all encompassing arbitration clause. As there was no express reference to claims for punitive damages in the agreement, a circumstance paralleled in the instant action, the Court evaluated whether the choice-of-law provision excluded punitive damages. It is quite instructive to compare the terms of the instant Agreement and the agreement in *Mastrobuono,* and the Court's interpretation thereof. With regard to the choice-of-law provisions, the relevant language of the instant Agreement includes, "Except as provided in Section 10, this Customer Agreement shall be governed by and construed, and the substantive rights and liabilities of the parties determined, in accordance with the laws of the State of New York." The *Mastrobuono* choice-of-law provision provides in part, "[t]his agreement shall ... be governed by the laws of the State of New York." *Mastrobuono,* 514 U.S. at 59, 115 S.Ct. 1212. Initially, the Court considered the choice-of-law provision as a form of accommodation, precluding the need to undergo a conflict of law analysis, which, in and of itself, did not constitute an intent to exclude a punitive damages claim. The Court went on to address the respondents sweeping interpretation of the choice-of-law clause, yet found that even an interpretation of "governed by the laws of the State of New York" which included New York's substantive rights and obligations, would not necessarily include the state's allocation of power between alternative tribunals, a determination which falls within the discretion of the arbitrator. *See id.,* 514 U.S. at 60, n. 4, 115 S.Ct. 1212. This analysis is directly on point

---

**13.** Although not raised by the parties, it is fitting to mention that *Mastrobuono* was decided on March 6, 1995, and the Agreement at issue went into effect in or about November 1994. The arbitration proceedings were initiated on May 7, 1996, after *Mastrobuono* was decided. However, to the extent applicable, the ruling in *Mastrobuono* has retroactive effect. *See Kidder, Peabody & Co., Inc., v. Marriner,* 961 F.Supp. 50, 55 n. 6 (S.D.N.Y.1997).

in the case at bar, and forecloses a variant interpretation.

The Court went on to analyze the arbitration provision, the relevant language included, "[unless unenforceable due to federal or state law, any controversy arising out of or relating to ... this agreement or the breach thereof, shall be settled by arbitration in accordance with the rules then in effect, of the National Association of Securities Dealers, Inc. or the Boards of Directors of the New York Stock Exchange, Inc. and/or the American Stock Exchange Inc. as I may elect.]" *Id.* at 58 n. 2, 115 S.Ct. 1212. This is in comparison with the Agreement the parties executed herein, which provides in relevant part, "all controversies which may arise between the [parties] concerning any transaction or the construction, performance or breach of this or any other agreement between the [parties], whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration to be held in accordance with the rules of the Board of Arbitration of the New York Stock Exchange, Inc., or the Code of Arbitration Procedure of the National Association of Securities Dealers Inc., whichever the undersigned may select." The Court looked to the language of the NASD rules, under which the *Mastrobuono* arbitration and the instant application proceeded, which authorized the arbitrators to award "damages and other relief." *Id.* at 61, 115 S.Ct. 1212. (citing NASD code of Arbitration Procedure ¶ 3741(e)). This provision, in conjunction with the following punitive damages section from the NASD arbitrator's manual, which provides: "The issue of punitive damages may arise with great frequency in arbitrations. Parties to arbitration are informed that arbitrators can consider punitive damages as a remedy," led the Court to conclude that the arbitration clause contradicts the conclusion that the parties agreed to foreclose claims for punitive damages. *Id.* The Court also referenced Rule 21(f)(4) of the NASD rules of Fair Practice which applies to agreements signed after September 7, 1989, inapplicable therein but relevant in the instant case, which reads: "No agreement [between a member and a customer] shall include any condition which ... limits the ability of a party to file any claim in arbitration or limits the ability of the arbitrators to make any award." [14]

14. The Court's reference to this rule was noted in a Notice to Members provided by the NASD, NTM Number 95–16, which informed its membership that "[some customer agreements attempt to directly limit the ability of a customer to file a claim or to limit the authority of the arbitrators to make an award, including an award of punitive damages. Others attempt to do so indirectly by the use of a so-called 'governing law clause.' For example, certain customer agreements simply states that New York law will govern any dispute in arbitration, but do not disclose that New York law prohibits an award of punitive damages in arbitration. Where the governing law clause is used to limit an award, it violates Section 21(f) of the NASD Rules of Fair Practice. Indeed in 1989 the SEC said that: 'customer agreements cannot be used to curtail any rights that a party may otherwise have had in a judicial forum. If punitive damages or attorneys fees would be available under applicable law, then the agreement cannot limit parties' rights to request them, nor arbitrators' rights to award them.' (See Securities Exchange Act Release No. 26805)]." The Notice went on to state, "the use of a governing law clause or other clause anywhere within a customer agreement that thwarts any NASD arbitration provision will be deemed violative."

This Notice received a substantial response from NASD members, prompting a clarifying Notice, NTM Number 95–85, which answered the following relevant questions in the following manner:
"Question: Is it permissible to include a disclosure in the customer agreement that the law governing the agreement prohibits or may prohibit an award of punitive damages in arbitration?
Answer: No. Such a disclosure would be inconsistent with the NYSE Rule 636(d) and Article III, Section 21(f)(4) of the NASD Rules of Fair Practice.
Question: If, under the governing law set forth in the customer agreement, punitive damages are not available in court, may a party assert this as a defense in an arbitration proceeding to a claim for punitive damages?
Answer: Yes, although the arbitrators will determine whether, or to what extent, this defense will be accepted."
The clarifying Notice also referenced SEC Release No. 34–26805 (May 10, 1989); 54 F.R. 21144, which provides: "This provision makes clear that the use of arbitration for the resolution of investor/broker-dealer disputes represents solely a choice of arbitration as a means of dispute resolution. Agreements cannot be used to curtail any rights that a party may otherwise have had in a judicial forum. If punitive damages or attorneys fees would be available under applicable law, then the agreement cannot limit parties' rights to request them, nor arbitrators

The Court then interpreted the two clauses together and reasoned that the agreement does not provide, as respondent suggested, for New York law relating to arbitration, rather, "at most, the choice-of-law clause introduced an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards." *Id.* The Court concluded, "we think the best way to harmonize the choice-of-law provision with the arbitration provision is to read 'the laws of the State of New York' to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators. Thus, the choice-of-law provision covers the rights and duties of the parties, while the arbitration clause covers arbitration; neither sentence intrudes upon the other.... The arbitral award should have been enforced as within the scope of the contract." *Id.* at 63–64, 115 S.Ct. 1212.

As a final additional consideration, the Court believed the common-law rule of *contra proferentem* to be quite germane to the factual setting, *id.* at 62, 115 S.Ct. 1212, and here, as well, any ambiguities arising from the Agreement must be resolved against the drafter, Stratton, and its principals and agents, the Petitioners.

This is just, because it "protect[s] the party who did not choose the language [of the Agreement] from an unintended or unfair result". *Id.* at 63, 115 S.Ct. 1212. Therefore, as Gardner did not draft, edit or alter the Agreement, nor play a role in the development of the controlling NASD Code, all ambiguities should be construed in his favor. Petitioners argument to the contrary, premised on the notion that the Agreement is an Adler Coleman document, and therefore not attributable to Stratton, is legally and factually frivolous. The first page of the "Retail New Account Application, Account Information/Customer Agreement," upper left corner, prominently reveals the Stratton Oakmont name and logo. The text of the "Customer Agreement" begins, "[i]n consideration of Stratton Oak-

mont, Inc. and Adler, Coleman Clearing Corp. introducing and accepting one or more accounts of the · undersigned ..." While the clearing company's name may appear more often in the text of the Agreement, this does not absolve Stratton of its role in the preparation of and control over the use of the Agreement. A similar claim was raised and disposed of in *Americorp Securities, Inc. v. Sager,* as the court found the agreement to be ambiguous and construed it against the drafter. 656 N.Y.S.2d 762, 764, 239 A.D.2d 115 (1st Dep't), *leave to appeal denied,* 90 N.Y.2d 808, 664 N.Y.S.2d 269, 686 N.E.2d 1364 (1997). · It noted, "[t]he drafter of· the arbitration agreement was actually Bear Stearns, Inc., petitioner's clearing agent. However, there is no dispute that petitioner utilized it as its own customer agreement, and that petitioner is the real party in interest here." *Id.* 656 N.Y.S.2d at 764 n. 1.

In the case at bar, the congruity to *Mastrobuono* prevents factual differentiation, and the legal issues challenged have been directly decided by the Supreme Court. Specifically, Petitioners' first contention that the Arbitrators were without authority to award punitive damages because private citizens simply do not have the power to punish, is clearly misguided in light of *Mastrobuono.*

The assertion that the arbitrators' imposition of punitive damages is violative of due process because there is no protection against arbitrary results, is also unsupported by precedent. The Court has repeatedly upheld arbitration as a valid and favored forum for resolution of contractual or statutory claims, in which "a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985); *see also Moses H. Cone Memorial Hosp.,* 460 U.S. at 1, 103 S.Ct. at 927 ("Section 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements,

rights to award them. The agreements may not be used to shorten applicable statutes of limitation, restrict the situs of an arbitration hearing

contrary to SRO rules, nor limit SRO forums available to parties." [Aff. Diane Zilka, Ex. 12].

notwithstanding any state substantive or procedural policies to the contrary.").

The Court finds that the arbitration procedures employed by the NASD Arbitration Panel afforded the Petitioners due process. This finding is based, in part, on the language of the Agreement requiring that: (1) all controversies arising out of the brokerage account shall be determined by arbitration; (2) the parties waived their rights to seek judicial remedies; (3) the parties were advised that pre-arbitration discovery is generally more limited than and different from court proceedings; and (4) the rights of appeal and to seek modification of the arbitrators' rulings are strictly limited. (Agreement ¶ 9). The finding is also based on the fact that the Petitioners participated in, or were afforded the opportunity to participate in, the arbitration hearings and the Petitioners testified under oath before the Arbitrators and submitted documentation in support of their claims and defenses. The Petitioners were fully aware of the terms of the Agreement and the rules and procedures of the arbitration process.

The Eleventh Circuit provided a thorough explanation of due process and punitive damages in the context of an arbitration award in *Davis v. Prudential Securities, Inc.*, 59 F.3d 1186 (11th Cir.1995). The arbitrators in *Davis* awarded the claimant punitive damages against the brokerage firm Prudential Securities, Inc. ("PSI") and the district court confirmed the award. PSI challenged the punitive damages award as violative of "the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution because arbitration lacks the procedural protections and meaningful judicial review required for the imposition of punitive damages." *Id.* at 1190. The court

unequivocally rejected this argument on basic constitutional precepts. Stating, "it is axiomatic that constitutional due process protections 'do not extend to private conduct abridging individual rights.'" *Id.* (quoting *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191, 109 S.Ct. 454, 461, 102 L.Ed.2d 469 (1988)(internal quotations omitted)). The court proceeded to examine the factors required to attribute state action to private conduct and, in accordance with many other courts, concluded that the "state action element of a due process claim is absent in private arbitration cases." *Id.* at 1191 (and cases cited therein). *See, also, Todd Shipyards Corp. v. Cunard Line, Ltd.*, 943 F.2d 1056, 1063–64 (9th Cir.1991)(finding argument that arbitrators award of punitive damages violated due process without merit as defendant agreed to arbitrate all disputes); *Barnes v. Logan*, No. C–96–0957, 1996 WL 310115, at *5 (N.D.Ca. May 29, 1996), *aff'd*, 122 F.3d 820 (9th Cir.1997)(holding punitive damage arbitration award did not violate due process); *R. Allen Fox, Ltd., v. Stratton Oakmont Inc.*, No. 93–C–2228, 1996 WL 288771, at *5 (N.D.Ill. May 29, 1996)(deciding punitive damages arbitration award was constitutional); *Greening v. Stratton Oakmont, Inc.*, No. C–95–4288, 1996 WL 61095, at *5 (N.D.Ca. Feb.5, 1996), *aff'd in part*, 113 F.3d 1241, 1997 WL 222327 (9th Cir.1997)(finding due process not violated by arbitral punitive damages award); *O'Brien v. Zangara*, 217 B.R. 26, 31 (Bankr.E.D.N.Y.1998)(holding arbitration proceeding afforded debtor due process rights). Furthermore, as the case reporters readily reveal, this was not the first such claim brought against Stratton.[15]

As the New York Court of Appeals recently stated in affirming a denial of a stay of

---

**15.** Stratton has a long history of litigation. *See, e.g., Greening v. Stratton Oakmont, Inc.*, 113 F.3d 1241, 1997 WL 222327 (9th Cir.1997)(affirming District Court's confirmation of arbitration award of punitive damages as against Porush); *Tanner v. Stratton Oakmont, Inc.*, 84 F.3d 432 (5th Cir.1996)(summary affirmance without opinion); *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046 (9th Cir.1996)(affirming district court's refusal to stay action pending arbitration in a partnership claim not arising from an individual partner's separate customer account); *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 213 B.R. 433 (S.D.N.Y.1997)(denying

Porush's motion for a protective order and granting Trustee's motion to compel); *Geiger v. Solomon–Page Group, Ltd.*, 933 F.Supp. 1180 (S.D.N.Y.1996)(dismissing claim against several underwriters and issuers, including Stratton, for failure to prove material misrepresentation in IPO); *Card v. Stratton Oakmont, Inc.*, 933 F.Supp. 806 (granting petitioner's motion for confirmation of the arbitration award in claim alleging *inter alia* fraud, RICO violations, and securities violations); *SEC v. Stratton Oakmont, Inc.*, No. 96–Misc.–0156, 1996 WL 312194, at *3 (D.D.C. June 5, 1996)(granting SEC right to make portion of materials previously under seal

arbitration, "it would be ironic and anomalous to permit parties from the securities industry, who generally derive benefits from the arbitration method they impose on their thousands of consumers, to elude the comprehensive language of their own industry-drafted arbitration agreements. Having agreed to plenary arbitration, they should not garner that strategic advantage against their aggrieved or dissatisfied customers." *Smith Barney Shearson Inc. v. Sacharow,* 91 N.Y.2d 39, 50, 666 N.Y.S.2d 990, 996, 689 N.E.2d 884 (1997). Finally, Petitioners' motion to vacate the award is receiving ample consideration by this Court within the guidelines of the FAA and established precedent. Accordingly, due process was not violated by the Arbitrators' imposition of punitive damages.

Petitioners final argument that the Arbitrators did not have the authority to punish

unlawful conduct through the imposition of punitive damages is invalidated by the holding in *Mastrobuono* and the aforementioned SEC and NASD directives, as well as numerous opinions confirming punitive damages in arbitration awards. These exact arguments were undoubtedly proffered by Petitioners' counsel in *In re Arbitration Between R.C. Layne Construction, Inc. and Stratton Oakmont, Inc.,* 228 A.D.2d 45, 651 N.Y.S.2d 973 (1st Dep't 1996), wherein the First Department reversed the Supreme Court's Order vacating the arbitration award. The customer agreement at issue utilized language equivalent to the instant Agreement. The First Department found the lower court's factual distinguishment of *Mastrobuono* to be, in effect, a distinction without a difference, and determined that the choice-of-law provision was not "an unequivocal exclusion of punitive damages claims." *Id.,* 651 N.Y.S.2d at 975. *See also Tucker v. Janney*

available and part of the public record); *SEC v. Stratton Oakmont, Inc.,* 878 F.Supp. 250 (D.D.C.1995)(granting SEC's motion for a permanent injunction); *SEC v. Stratton Oakmont, Inc.,* No. 94–CV–2681, 1995 WL 46559, at *2 (D.D.C. Jan.11, 1995)(granting a preliminary injunction against Stratton for its continued violation of an SEC Order, because of the court's prior finding that "the practices of Stratton which were the subject of the earlier litigation are highly dangerous to the interests of the investing public and cannot be permitted to continue."); *SEC v. Stratton Oakmont, Inc.,* 94–CV–2681, 1994 WL 721502, at *4–5 (D.D.C. Dec.19, 1994)(granting temporary restraining order against Stratton from its continued violation of a SEC Order); *SEC v. Stratton Oakmont, Inc.,* 92–CV–1993 (S.D.N.Y. Feb. 24, 1994)(SEC sues Stratton and Porush and others for various fraudulent acts in connection with the offer and sale of securities to members of the investing public and with manipulation of one of those securities); *R. Allen Fox, Ltd. v. Stratton Oakmont, Inc.,* No. 93–C–2228, 1996 WL 288771, at *5 (N.D.Ill. May 29, 1996)(confirming arbitration award as against Stratton based on plaintiffs' claims of fraud, breach of fiduciary duty, etc., including award of punitive damages); *Greening v. Stratton Oakmont, Inc.,* No. 95–C–4288, 1996 WL 61095, at *5 (N.D.Ca. Feb.5, 1996)(granting petition to confirm arbitration award including punitive damages); *Kopman v. Stratton Oakmont, Inc.,* No. 94–CV–2300, 1995 WL 110355, at *2 (N.D.Ga. Jan. 13, 1995)(vacating punitive damage award as against stockbroker employee of Stratton); *Stratton Oakmont, Inc., v. Nicholson,* 868 F.Supp. 486, 489 (E.D.N.Y.1994)(vacating punitive damage arbitration award in this

pre-*Mastrobuono* decision); *Lemire v. Stratton Oakmont, Inc.,* No. 94–M–548, 1994 WL 780180, at *2 (D.N.H. Dec.2, 1994)(dismissing claims and compelling arbitration of plaintiff's suit for mishandling of securities trades); *R. Allen Fox, Ltd. v. Stratton Oakmont, Inc.,* No. 93–C–2228, 1993 WL 433777, at *5 (N.D.Ill. Oct.25, 1993)(granting defendants motion to stay proceedings pending arbitration of the plaintiffs' multi-count complaint alleging, *inter alia,* fraud, breach of fiduciary duty and negligent misrepresentation); *Hammel v. Stratton Oakmont, Inc.,* No. 91–K–1218, 1992 WL 163661, at *1 (D.Kan. June 4, 1992)(granting defendants' motion to compel arbitration of plaintiff's fraud claims); *Shaffer v. Stratton Oakmont, Inc.,* 756 F.Supp. 365 (N.D.Ill.1991)(denying Stratton's motion to stay the proceedings and to compel arbitration because Stratton was an "introducing broker" and not a "clearing broker" and the customer agreement was with the "clearing broker"); *Classie v. Stratton Oakmont, Inc.,* 653 N.Y.S.2d 377, 236 A.D.2d 505 (2d Dep't 1997)(reversing default judgment entered as against Stratton in this sexual harassment suit); *In re Arbitration Between R.C. Layne Construction, Inc. and Stratton Oakmont, Inc.,* 651 N.Y.S.2d 973, 228 A.D.2d 45 (1st Dep't 1996)(reversing lower court's order vacating arbitration award and reinstating the award which included punitive damages); *Stratton Oakmont, Inc. v. Prodigy Services Co.,* 1995 WL 805178, at *3 (N.Y.Sup. Dec.11, 1995)(denying defendants' motion for renewal and/or reargument of Stratton's summary judgment motion); *Stratton Oakmont, Inc. v. Prodigy Services Co.,* 1995 WL 323710, at *1 (Nassau Sup. May 24, 1995)(granting partial summary judgment in Stratton's favor in this libel suit).

*Montgomery Scott,* No. 96–CV–1823, 1997 WL 151509, at *4 (S.D.N.Y. April 1, 1997)(allowing punitive damages claims to go forward); *Prudential Securities Inc., v. Laurita,* No. 95–CV–7737, 1997 WL 109438, at *5 (S.D.N.Y. March 11, 1997)(denying Prudential's petition for a stay to prevent arbitrator from awarding punitive damages in light of *Mastrobuono* ); *Cowen & Co. v. Tecnoconsult Holdings Ltd.,* No. 96–CV–3748, 1996 WL 391884, at *5 (S.D.N.Y. July 11, 1996)(denying petitioners' application to prevent arbitrators from awarding punitive damages in light of *Mastrobuono* ); *Kidder, Peabody & Co., Inc. v. Marriner,* 961 F.Supp. 50, 54 (S.D.N.Y.1997)(in denying a stay of arbitration, the Court found *Mastrobuono* does not bar arbitrators from awarding punitive damages); *A.S. Goldmen & Co., Inc. v. Bochner, M.D.,* No. 96–CV–1285, 1996 WL 413676, at *1 (S.D.N.Y. July 24, 1996)(denying petition to stay the arbitration's pending claims for punitive damages, based upon the similarity to *Mastrobuono* ); *PaineWebber, Inc. v. Richardson,* No. 94–CV–3104, 1995 WL 236722, at *2, 3 (S.D.N.Y. April 21, 1995)(denying stay of arbitration as it relates to punitive damages which the Court found were allowed in light of *Mastrobuono* ); *Sager,* 239 A.D.2d 115, 656 N.Y.S.2d 762 at 764 (reversing stay of arbitration because arbitration clause did not unequivocally exclude punitive damages claim); *Mulder v. Donaldson, Lufkin & Jenrette,* 224 A.D.2d 125, 128, 648 N.Y.S.2d 535, 538 (1st Dep't 1996)(holding "[i]n sum, the decision of the Supreme Court in *Mastrobuono* makes it unmistakably clear that, with respect to arbitration proceeding governed by the FAA which preempts the *Garrity* rule, the arbitration of punitive damage claims is required except where the parties have unequivocally agreed otherwise"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Adler,* 234 A.D.2d 139, 140, 651 N.Y.S.2d 38, 39 (1st Dep't 1996)(reversing lower court stay of arbitration of punitive damages because choice-of-law provision was ambiguous, as in *Mastrobuono,* and therefore strong federal policy favoring arbitration included deciding punitive damages award); Matter of Arbitration Between *Prudential Securities Inc. (Pesce),* 642 N.Y.S.2d 466, 468, 168 Misc.2d 699, 703 (1996)(leaving puni-

tive damages issue to arbitrators because *Mastrobuono* preempts the *Garrity* rule); *but cf. Eberle v. BMCA Insulation Products Inc.,* No 95–CV–10378, 1996 WL 337262, at *3 (S.D.N.Y. June 19, 1996)(denying respondent right to seek punitive damages in arbitration proceeding because choice-of-law clause was not in conflict with customer agreement which provides for application of American Arbitration Association ("AAA") rules, not NASD rules, and AAA rules do not evidence a strong presumption that punitive damages will be available).

## A. EXCESSIVENESS OF THE PUNITIVE DAMAGES AWARD

■ The Petitioners' challenge the punitive damage award as so excessive as to be constitutionally impermissible. Two Supreme Court decisions with differing results help illustrate the relevant analysis of excessiveness of punitive damages. *See BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)(the Court reversed a jury rendered verdict of $4,000 in compensatory damages and $4,000,-000 in punitive damages, which the Alabama Supreme Court had reduced to $2,000,000) and *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)(the Court upheld a jury rendered $10,000,000 punitive damage award, which was more than 526 times as large as the actual damages award, in a common law action for slander of title).

To initiate an inquiry into excessiveness, the first focus in on the scope of the jurisdiction's legitimate interest in punishing and deterring future misconduct of this kind. *BMW,* 517 U.S. at 568, 116 S.Ct. at 1595. In *BMW,* the misconduct was the automaker's failure to disclose repairs of minor damage to new cars, prior to delivery to retail new car purchasers. The Court found a patchwork of disclosure requirements throughout the fifty states. Consistent with the axiomatic principles of state sovereignty and comity, no state could impose economic sanctions on tortfeasors to effectuate a change of conduct that is lawful in other states. *Id.* at 572, 116 S.Ct. at 1596–97. In the case at bar, the misconduct was violative of federal securities regu-

lations and Congressional authority to regulate interstate commerce is absolute. In this regard, the legitimate interest in punishment and deterrence is unqualified.

Turning to the element of fairness and notice, the Supreme Court in *BMW* evaluated three guideposts in determining that the punitive damages award was excessive, which can be generalized as: (1) the degree of reprehensibility of the conduct; (2) the disparity between the harm or potential harm suffered and the punitive damages award; and (3) a comparison of potential penalties that could be or have been imposed for similar misconduct in analogous cases. *Id.* at 574–75, 116 S.Ct. at 1598–99.

Finding the first consideration the most telling, the Court distinguished the *TXO* decision on what could loosely be described as the blameworthiness of the Petitioners. In upholding the award as not so grossly excessive in *TXO*, the Court was strongly influenced by the jurors' likely belief that the "petitioner set out on a malicious and fraudulent course" while the "scheme employed . . . was part of a larger pattern of fraud, trickery and deceit" and the petitioner acted in bad faith and was quite wealthy. *TXO*, 509 U.S. at 462, 113 S.Ct. at 2722. Whereas the Court in *BMW* found no evidence of "deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive." *BMW*, 517 U.S. at 579, 116 S.Ct. at 1601. In light of Stratton and the individual Petitioners' storied infamy within the competitive and combative securities industry and their ongoing activities in contravention of the SEC consent decree, and the court imposed permanent injunction, and in conjunction with the trading practices exhibited in Gardner's account, the Arbitrator's punitive damages award cannot be said to be a manifest disregard of the law. Rather, after all other measures have failed to prevent Stratton and the individual Petitioners' continued fleecing of their trusting clients, a punishment this extreme may represent the Arbitrators last resolve in an attempt to permanently bankrupt the Petitioners, for the eternal betterment of the investing public. Although the ten million dollars presents an imposing figure standing alone, relative to the ill-gotten gains of Stratton and the Petitioners', it seems utterly reasonable. .

The second *BMW* guidepost evaluates the actual/punitive damages ratio. Once again the Court iterated its rejection of a categorical approach, and endorsed a case by case inquiry, " '[w]e need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness . . . properly enter[s] into the constitutional calculus.' " *BMW*, 517 U.S. at 582–83, 116 S.Ct. at 1602 (quoting *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1 (1991)). The Court was concerned by the 500 to 1 ratio, which "must surely raise a suspicious judicial eyebrow," especially in light of the lack of additional potential harm. *Id.*, 116 S.Ct. at 1603.

In *TXO*, the Court eschewed employing a direct correlation between the actual and punitive damages because it is "appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim . . . as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." *TXO*, 509 U.S. at 460, 113 S.Ct. at 2722 (emphasis in original).

This directly touches upon an issue Petitioners raise in the case at bar. During the arbitration, the Arbitrators considered evidence of Stratton's ongoing litigation and violation of the SEC consent decree. Such evidence, the Petitioners assert, was irrelevant, highly prejudicial and inflammatory, and poisoned the arbitrators against the Petitioners. The petitioners in *TXO* protested the admission of evidence of alleged wrongdoing in other parts of the country as well as evidence of net worth. To the contrary, the Court found it well settled law that these type of factors are typically contemplated in assessing punitive damages, and had previously approved consideration of "(b) . . . the existence and frequency of similar past conduct; . . . (d) the 'financial position' of the defendant." *TXO*, 509 U.S. at 462 n. 28, 113 S.Ct. at 2722 n. 28 (quoting *Haslip*, 499 U.S. at 21–22, 111 S.Ct. at 1045 (1991)); *see also*

*BMW,* 517 U.S. at 576–77, 116 S.Ct. at 1599, 1600 ("Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law.... repeated misconduct is more reprehensible than an individual instance of malfeasance"). The Arbitrators received into evidence documents which were relevant in determining punitive damages, and the consideration thereof is not indicia of partiality, prejudice or fraud.

As the Court in *BMW* moved on to the third guidepost, a comparison of the punitive damages awarded and the potential civil or criminal penalties that could be imposed for comparable misconduct, it noted that the maximum fine BMW potentially faced was $2,000 in Alabama, and substantially less in most other states. *BMW,* 517 U.S. at 583–84, 116 S.Ct. at 1603. In addition, because of the huge disparity between the potential fine and the punitive award levied, the Court could not conclude that a lesser deterrent would not have achieved the same goal. *Id. Haslip,* by comparison, involved the potential for not only civil fines, albeit in an amount far less than the punitive damages imposed, but also criminal imprisonment. *Haslip,* 499 U.S. at 24, 111 S.Ct. at 1046. Due in part to this distinction, the *Haslip* Court affirmed the judgment, finding the award did "not cross the line into the area of constitutional impropriety." *Id.* This distinction is quite instructive in the instant action.

The securities laws and regulations arose from federal legislation enacted to protect the investing public. Among the variety of the SEC's enforcement powers is the authority to seek temporary or permanent injunctive relief, in the courts "whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation." 15 U.S.C. §§ 77t(b), 78u(d). In addition, the SEC is to cooperate with the Attorney General and provide evidence of violations of the rules or regulations, for criminal proceedings, if necessary. *See* 15 U.S.C. § 78u(d). The availability of criminal proceedings and injunctive relief, as specifically codified within the securities laws, reveals a congressional intent to make harsh sanctions available for potential violations. Even exorbitant punitive damage awards are not inconsistent with these potential penalties.

The arbitration hearings were held in April of 1997. At that point in time, as discussed earlier, an SEC action against Stratton, Porush, and others, for fraudulent acts in connection with the offer and sale of securities to members of the investing public and the manipulation of one of those securities, had commenced in the Southern District of New York and the SEC had obtained a temporary restraining order, a preliminary injunction and ultimately a permanent injunction against Stratton for its continuing violation of an SEC Order in the District Court of the District of Columbia. *See* fn. 13 and the cases cited therein. The injunctive relief was granted, in part, because "the practices of Stratton ... are highly dangerous to the interests of the investing public and cannot be permitted to continue." *SEC v. Stratton Oakmont, Inc.,* No. 94–CV–2681, 1995 WL 46559, at *2 (D.D.C. Jan.11, 1995). It is important to note that the SEC faces a more rigorous standard when applying for such injunctive relief, in addition to the conventional showing of a substantial likelihood of success on the merits, the SEC must show that there is a risk of future violations and that the seriousness of the violation warrants the preliminary relief. *See SEC v. Unifund SAL,* 910 F.2d 1028, 1040 (2d Cir.1990).

After concluding that the Petitioners were liable to the Claimant, the Arbitrators, in determining the punitive damages award, may have reasonably concluded that the previous sanctions imposed upon Stratton were ineffectual in preventing Petitioners' persistent practices deemed dangerous to the investing public, and that a sizeable award might have a deterrent effect.

On its face, the disparity between the award for compensatory damages and punitive damages may raise a suspicious judicial eyebrow, however, one need not don an examiner's pince-nez to find ample justification for the deviation. Just as in *TXO* and *Has-*

*lip*, the Petitioners' conduct was motivated by greed, avarice and fraud, and the Supreme Court's reluctance to set aside a disproportionate punitive damages award reflects the underlying policy considerations of punishment and deterrence.

Although Gardner's fortuitous misfortune in selecting Stratton as his stock broker was juridically transformed into a gratuitous fortune, the magnitude of the recipient's unanticipated bonanza does not belie the rationale of the punitive damages award. Such windfalls stand as one of life's logical aberrations; a doctrine designed to deter and punish, not compensate, provides at times, the richest compensation of them all. Still, the Arbitrators' $10,000,000 aggregate punitive damages award was constitutionally sound and supported by the evidence, and will therefore not be vacated or modified.

## IV. OTHER MOTIONS

Respondent Gardner also moves the Court for an Order of Attachment, pursuant to Fed.R.Civ.P. 64, as against all property and assets owned or controlled by Petitioner Porush, and an order compelling the deposition of Porush. By stipulation dated June 10, 1997, Porush agreed to take no steps to assign, dispose of, encumber, secrete, transfer or remove any property or assets controlled by him, other than in the normal course of business, pending resolution of this motion.

Because the Court has rendered a final decision and granted Respondent's motion to confirm the arbitration award, the provisional pre-judgment remedies of Rule 64—to be used at the commencement of and during the course of an action—are no longer applicable. Accordingly, any discovery, if needed, shall be requested in accordance with Rule 69 to enforce the judgment.

## V. BANKRUPTCY STAY

It was first reported to the Court on May 11, 1998, that Steven P. Sanders filed a bankruptcy petition on April 30, 1998 and that Jordan Shamah filed a bankruptcy petition on August 20, 1997. Insofar as this Memorandum and Order was substantially completed by May 11, 1998, for purposes of judicial economy and clarity, it will not be revised.

However, because Steven P. Sanders and Jordon Shamah have filed bankruptcy petitions during the pendency of this action, pursuant to the relevant sections of 11 U.S.C. §§ 362(a)(1) and (2), the filing of a bankruptcy petition operates as a stay, applicable to all entities, of

(1) commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title.

The automatic stay provided by 11 U.S.C. § 362(a)(1) operates to stay the continuation of a judicial, administrative or other action or proceeding against the debtor that was commenced before the filing of a bankruptcy petition or to recover a claim against the debtor that arose before the filing of a bankruptcy petition. *See, e.g., N.Y. Stock Exchange v. Shearson Lehman Hutton Inc.*, 943 F.2d 249, 250 (2d Cir.1991)(filing of bankruptcy petition stayed appeal of district court's confirmation of arbitration award); *Wolf Fin. Group, Inc. v. Hughes Constr. Co.*, 1994 WL 913278, at *2 (Bankr.S.D.N.Y. Dec.15, 1994)("There is no dispute that prosecution of the civil actions … and the NASD arbitration proceedings is stayed as to the debtors pursuant to § 362(a)(1) of the Code.").

Accordingly, the provisions of this Memorandum and Order, as applied to Sanders and Shamah have no immediate legal effect and are stayed pending disposition in bankruptcy court. The parties are directed to inform the Court if and when the bankruptcy court grants relief from the automatic stay provisions or when the automatic stay lapses. At that time the parties may submit affida-

vits regarding any changed circumstances since the date of this Order.

## CONCLUSION

For all the aforementioned reasons, and because the Petitioners have failed individually and collectively to prove that the Arbitrators' challenged Award:

(1) should be vacated, modified, or corrected as prescribed in Sections 10 and 11 of the Federal Arbitration Act; or

(2) was rendered in manifest disregard of the law; or

(3) was constitutionally defective,

it is HEREBY

ORDERED, Respondent F. Clark Gardner's motion to confirm the Award is granted in its entirety;

ORDERED, Petitioner Steven P. Sanders' motion to vacate the Award is denied in its entirety;

ORDERED, Petitioner Daniel M. Porush's motion to vacate the Award is denied in its entirety;

ORDERED, Petitioner Jordan Shamah's motion to vacate the Award is denied in its entirety;

ORDERED, Petitioner Andrew T. Greene's motion to vacate the Award is denied in its entirety;

ORDERED, Respondent F. Clark Gardner's motion for attachment and to compel a deposition is denied as moot.

ORDERED, the Award of the Arbitration Panel, confirmed in its entirety, the relevant sections of which are recited herein:

1. Daniel M. Porush, Jordan Shamah, Andrew T. Greene and Steven P. Sanders, jointly and severally, are liable to and shall pay F. Clark Gardner compensatory damages in the amount of $184,583.

2. Daniel M. Porush, Jordan Shamah, Andrew T. Greene and Steven P. Sanders, jointly and severally, are liable to and shall pay F. Clark Gardner interest at 10% commencing from December 12, 1995 through April 10, 1997, in the amount of $24,375.

3. Daniel M. Porush is liable to and shall pay F. Clark Gardner punitive damages in the amount of $4,000,000.

4. Jordan Shamah is liable to and shall pay F. Clark Gardner punitive damages in the amount of $2,000,000.

5. Andrew T. Greene is liable to and shall pay F. Clark Gardner punitive damages in the amount of $2,000,000.

6. Steven P. Sanders is liable to and shall pay F. Clark Gardner punitive damages in the amount of $2,000,000.

7. Daniel M. Porush, Jordan Shamah, Andrew T. Greene and Steven P. Sanders, jointly and severally, are liable to and shall pay F. Clark Gardner his initial filing fee of $200.

ORDERED, legal effect and enforcement of this Order as against Steven P. Sanders and Jordon Shamah is automatically stayed pursuant to 11 U.S.C. § 362.

ORDERED, the Clerk of the Court is directed to administratively close the case pending resolution of the stay.

SO ORDERED.